KILPATRICK TOWNSEND & STOCKTON LLP
LARRY W. MCFARLAND (State Bar No. 129668)
LMcFarland@kilpatricktownsend.com
DENNIS L. WILSON (State Bar No. 155407)
DWilson@kilpatricktownsend.com
CHRISTOPHER T. VARAS (State Bar No. 257080)
CVaras@kilpatricktownsend.com
9720 Wilshire Blvd PH
Beverly Hills, CA  90212-2018
Telephone:   310-248-3830
Facsimile:    310-860-0363

JOSEPH PETERSEN (*pro hac vice* motion forthcoming)
JPetersen@kilpatricktownsend.com
The Grace Building
1114 Avenue of the Americas
New York, NY 10036-7703
Telephone:  212-775-8700
Facsimile:  212-775-8800

Attorneys for Plaintiff
LIONS GATE FILMS INC.

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| LIONS GATE FILMS INC., | Case No. 2:14-cv-06033-MMM-AGR |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER, ASSET RESTRAINING ORDER, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |
| v. | |
| JOHN DOES 1-10 inclusive, d/b/a, <limetorrents.com>, <billionuploads.com>, <hulkfile.eu> <played.to>, <swankshare.com> and <dotsemper.com>, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

RELEVANT FACTS ............................................................................................... 2

    A.    "The Expendables 3" and Lions Gate's Rights. ................................ 2

    B.    The Pre-Release Theft and Leak of the Film. .................................. 3

    C.    Defendants' Willful Infringement of Lions Gates' Rights and the Ongoing Irreparable Harm to Lions Gate. ............................................................................................... 5

ARGUMENT ........................................................................................................... 9

    A.    The Standard for Issuance of a Temporary Restraining Order and Preliminary Injunction to Prevent Copyright Infringement. ................................................ 9

    B.    Lions Gate is Entitled to a Temporary Restraining Order and Preliminary Injunction to Prevent the Further Infringement of the Film. .................................... 10

        1.    This Court has Personal Jurisdiction over Defendants. ......................................................................... 10

        2.    Lions Gate is Likely to Succeed on all of its Claims Against Defendants. ............................................ 11

            a.    Lions Gate is Likely to Prevail on its Claim for Direct Copyright Infringement. ...................................................... 11

            b.    Lions Gate is Likely to Succeed on its Claim for Contributory Copyright Infringement. ...................................................... 12

            c.    Lions Gate is Likely to Succeed on its Claim for Vicarious Copyright Infringement. ...................................................... 13

        3.    Lions Gate will Suffer Irreparable Harm if the Court does not Grant Immediate Relief. .............................. 13

        4.    The Balance of Equities Tips Sharply in Lions Gate's Favor. ......................................................... 15

        5.    An Injunction is in the Public Interest. ................................ 15

        6.    The Scope of Lions Gate's Requested Injunction is Reasonable and Within the Court's Discretion. ................................................ 16

C.  The Court Should Require No Bond or, in the
Alternative, a Minimal Bond. ........................................................17

D.  Defendants Have Received Notice and *Ex Parte*
Relief is Warranted. ......................................................................17

E.  Lions Gate is Entitled to an Order Preventing the
Transfer of Defendants' Assets......................................................18

CONCLUSION.................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.,*
   239 F.3d 1004 (9th Cir. 2001) .................................................................. 11, 12, 13

Apple Computer, Inc. v. Franklin
   Computer Corp., 714 F.2d 1240 (3rd Cir.1983) ..................................................... 16

*Barahona–Gomez v. Reno,*
   167 F.3d 1228, 1237 (9th Cir.1999) ........................................................ 17

*Concrete Mach. Co. v. Classic Lawn*
   *Ornaments, Inc.,* 843 F.2d 600 (1st Cir.1988) ........................................ 15

*D.C. Comics v. Towle,*
   -- F.Supp.2d --, CV 11-3934 RSWL OPX,
   2013 WL 541430 (C.D. Cal. Feb. 7, 2013) ........................................... 11

*Datatech Enters. LLC v. FF Magnat Ltd.,*
   2012 WL 4068624 (N.D. Cal. Sept. 14, 2012) ......................................... 18

*Ellison v. Robertson,*
   357 F.3d 1072 (9th Cir. 2004) ............................................................ 12

*Federal Trade Commission v. United*
   *States Oil & Gas Corp.,* 748 F.2d 1431
   (11th Cir. 1984)............................................................................ 18

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
   76 F.3d 259 (9th Cir. 1996) ................................................................ 13

*Jorgensen v. Cassiday,*
   320 F.3d 906 (9th Cir. 2003) .............................................................. 17

*Lockheed Missile & Space Co. v. Hughes*
   *Aircraft,* 887 F.Supp. 1320 (N.D.Cal.1995) ........................................... 10

*Metro-Goldwyn-Mayer Studios Inc. v.*
   *Grokster, Ltd.,* 545 U.S. 913, 125 S. Ct. 2764,
   162 L. Ed. 2d 781 (2005)................................................................... 12

*Metro-Goldwyn-Mayer Studios, Inc. v.*
   *Grokster, Ltd.,* 518 F.Supp.2d 1197

(C.D. Cal. 2007) ................................................................ 15, 16

*Mission Power Eng'g Co. v. Cont'l Cas. Co.*,
   883 F.Supp. 488 (C.D. Cal. 1995) ........................................ 17

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) ............................................. 10

*Reebok Int'l, Ltd. v. Marnatech*
   *Enterprises, Inc.*, 970 F.2d 552 (9th Cir. 1992) ...................... 18

*Righthaven LLC v. Hoehn*,
   716 F.3d 1166 (9th Cir. 2013) ............................................. 12

*Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*,
   907 F. Supp. 2d 1086 (N.D. Cal. 2012) .................................. 9

*Stuhlbarg Int'l Sales Co., Inc. v. John D.*
   *Brush & Co.*, 240 F.3d 832 (9th Cir.2001) ............................. 9

*Triad Sys. Corp. v. Se. Exp. Co.*,
   64 F.3d 1330 (9th Cir. 1995) ............................................. 15

*Warner Bros. Entm't v. WTV*
   *Systems, Inc.*, 824 F.Supp.2d 1003
   (C.D. Cal. 2011) ............................................. 12, 14, 15, 16

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7, 129 S.Ct. 365 (2008) ......................................... 9

*Yahoo! Inc. v. La Ligue Contre Le Racisme*
   *Et L'Antisemitisme*, 433 F.3d 1199
   (9th Cir. 2006) ............................................................ 10

**Statutes**

15 U.S.C. § 501 ............................................................ 11, 12

17 U.S.C. § 106 ............................................................... 11

17 U.S.C. § 502 ........................................................ 9, 11, 16

17 U.S.C. § 504 ............................................................... 18

17 U.S.C. § 506 ............................................................ 8, 15

1

**Rules**

Federal Rule of Civil Procedure § 65 ................................................................ 16, 17

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## **INTRODUCTION**

2
    *Three weeks* before the release of "The Expendables 3" – one of the most

3
anticipated films of 2014 – the film was stolen and uploaded to the Internet where it

4
has now been downloaded more than two million times and counting.  The

5
defendants in this action are distributing copies of the stolen film and have refused

6
Lions Gates' repeated demands that they stop.

7
    The film at issue (the "Film") is the third installment in the blockbuster "The

8
Expendables" franchise, and is one of the most anticipated films of 2014.  The first

9
two films in the franchise, "The Expendables" and "The Expendables 2", generated

10
worldwide box office revenues in excess of $575 million.  The Film's cast includes

11
several of the most well-known actors in the world, including Sylvester Stallone,

12
Jason Statham, Arnold Schwarzenegger, Mel Gibson, Harrison Ford, Wesley

13
Snipes, Dolph Lundgren and Antonio Banderas among many others.

14
    Lions Gate has been licensed the sole and exclusive right to distribute and

15
exploit the Film in the United States and throughout North America, and has

16
invested millions of dollars in the promotion of the Film, which will not be released

17
until August 15, 2014.  On or about July 24 of this year, Lions Gate learned that a

18
digital file containing a high quality reproduction of the Film had been stolen and

19
uploaded to the Internet without Lions Gate's authorization or consent.  Based on its

20
investigation to date and the fact that the Film is still weeks from its official release,

21
Lions Gate believes that only a single digital file containing the Film was stolen and

22
that every copy of the Film currently available anywhere on the Internet originated

23
from and is a reproduction of that single original digital file.  These copies are

24
referred to in this memorandum as the "Stolen Film."

25
    Defendants in this action operate websites that are distributing, reproducing,

26
performing and otherwise exploiting the Stolen Film in egregious violation of Lions

27
Gate's exclusive rights.  Lions Gate has repeatedly contacted Defendants by email

28
and demanded that they cease their infringement, but Defendants continue to

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION                                                    - 1 -
CASE NO. 2:14-CV-06033-MMM-AGR

distribute and/or aid in the distribution of the Stolen Film.  With the irreparable harm from Defendants' infringement increasing by the day (and, in fact, the hour), Lions Gate now has no option but to seek immediate relief from this Court.

## **RELEVANT FACTS**

### A.    **"The Expendables 3" and Lions Gate's Rights.**

The Film at issue in this case is "The Expendables 3," which is the forthcoming third installment in the blockbuster "The Expendables" motion picture franchise.  (Declaration of Robert Wenokur ("Wenokur Decl."), ¶ 6.)  The Film is scheduled for theatrical release in North America on August 15, 2014, and has not been released to date.  (Wenokur Decl., ¶6.)  The cast of the Film includes some of the largest stars in cinema, including Sylvester Stallone, Jason Statham, Arnold Schwarzenegger, Mel Gibson, Harrison Ford, Wesley Snipes, Dolph Lundgren and Antonio Banderas among many others.  (Wenokur Decl., ¶ 6.)  The first two films in this franchise, "The Expendables" and "The Expendables 2" generated worldwide box office revenues in excess of $575 million.  (Wenokur Decl, ¶ 7.)

Lions Gate has obtained the sole and exclusive right to distribute and exploit the Film in the United States and throughout North America.  (Wenokur Decl., ¶ 8.)  Lions Gate's exclusive rights in the Film pursuant to this exclusive license include but are not limited to all rights in the United States and throughout North America to exploit the Film by means of direct exhibition in theaters, by means of the Internet and in all home video media, among other rights.  (*Id*.)  A true and correct copy of the agreement granting Lions Gate such rights (with portions redacted to protect certain confidential information) is attached to the Wenokur Decl. as Exhibit A.

The Film is the subject of a pending application for expedited registration with the United States Copyright Office, which has been assigned the application Receipt No. 1-QVTXDT.  (Wenokur Decl., ¶ 9.)  A true and correct copy of the application receipt and request for special handling are attached to the Wenokur Decl. as Exhibit B.  In addition, the screenplay for the Film is the subject of United

1   States Copyright Registration No. PAu003704583, issued on July 10, 2013, which is

2   valid, subsisting and in full force and effect.  (*Id*., ¶ 10.)  A true and correct copy of

3   the registration certificate is attached to the Wenokur Decl., as Exhibit C.  The Film

4   is a derivative work based on the registered screenplay.

5          Given the success of the first two films, Lions Gate anticipates that the Film

6   will be highly successful as well.  (Wenokur Decl., ¶ 11.)  Accordingly, Lions Gate

7   has invested millions of dollars in terms of acquiring distribution rights to the Film

8   and millions more in connection with marketing and promoting the Film's release.

9   (*Id*.)  Lions Gate has planned and has already begun to execute an extensive

10  marketing and publicity campaign for the Film including television, radio and print

11  advertising and promotion.  (*Id*., ¶ 12.)  Lions Gate has not authorized anyone to

12  distribute the Film within the United States or North America on the Internet or

13  anywhere else prior to the planned release date.  (*Id*., ¶ 13.)

14         **B.     The Pre-Release Theft and Leak of the Film.**

15         As part of Lions Gate's customary anti-piracy efforts, the company retained

16  outside vendors, including MarkMonitor, to identify and address as appropriate any

17  potential or actual piracy relating to the Film.  (Wenokur Decl., ¶ 14.)  On or about

18  July 24, 2014, Lions Gate learned that a digital file containing a high quality

19  reproduction of the Film had been uploaded to the Internet without Lions Gate's

20  authorization or consent.  (*Id*., ¶ 15.)  While investigations are ongoing, Lions Gate

21  has now come to believe that an individual unlawfully obtained a copy of the Film

22  through fraudulent or otherwise unlawful means.  (*Id*.)  Simply put, this copy of the

23  Film is believed by Lions Gate to have been stolen.  (*Id*.)

24         Lions Gate understands that only a single digital file containing the Film was

25  stolen, and that every copy of the Film alleged in this complaint (and every copy

26  available anywhere on the Internet) originated from and is a reproduction of that

27  single original digital file.  (Wenokur Decl., ¶ 16.)

28         Even a single unauthorized leak of a film property such as the one at issue in

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION                        - 3 -
CASE NO. 2:14-CV-06033-MMM-AGR

this action can have immediate and severe adverse consequences to film distribution companies such as Lions Gate.  (Wenokur Decl., ¶ 17.)  Digital technology enables exact duplication of copyrighted content at the mere press of a computer keypad or mouse.  (*Id*.)  Accordingly, from a single digital copy of a work thousands upon thousands of near exact copies of the work can proliferate seemingly if not literally overnight.  (*Id*.)

Only days after the leak at issue was detected copies of the Film in its entirety were available on literally hundreds of websites and Lions Gate understands that as of today the Film has been downloaded more than 2.1 million times worldwide on peer-to-peer networks[1], including approximately 247,000 downloads in the United States.  (Declaration of Edward Cho ("Cho Decl."), ¶ 6.)  Of the United States peer-to-peer downloads, Lions Gate estimates that approximately 21,000 (or 8.5%) were to individuals in the Los Angeles metropolitan area.  (Cho Decl., ¶ 7.)  The Stolen Film is also available on the Internet for downloading and streaming through websites that do not constitute peer-to-peer networks.  (*Id*., ¶ 6.)  Lions Gate estimates that the Stolen Film has been downloaded and/or streamed hundreds of thousands if not millions more times worldwide outside of peer-to-peer networks. (*Id*.)

Given the seriousness of the threat posed by the leak of the Film, Lions Gate immediately instructed MarkMonitor to devote substantial resources to cataloging all websites and online services offering pirated copies of the Film.  (Wenokur Decl., ¶ 18.)  Further, Lions Gate instructed MarkMonitor to follow up with take-down requests to the operators of the sites in question.  (*Id*.)  MarkMonitor has sent approximately 2,770 take-down requests covering, cumulatively, 10,846 unique host

---

[1] Peer-to-peer networks are distinguished by the fact that the information available for access does not reside on a central server; rather, each computer in the peer-to-peer network makes information available to every other computer in the peer-to-peer network.  (Declaration of Edward Cho ("Cho Decl."), ¶ 6.)

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION                                    - 4 -
CASE NO. 2:14-CV-06033-MMM-AGR

1   URLs (since a single website often has multiple URLs hosting the Stolen Film,

2   MarkMonitor can and does request that the operator of a single website remove

3   multiple unique host URLs).  (Cho Decl., ¶ 9.)  In the vast majority of instances the

4   recipients responded by taking down the Stolen Film and otherwise taking steps to

5   avoid the piracy of the Stolen Film.  (*Id*.)

6       **C.    Defendants' Willful Infringement of Lions Gates' Rights**

7       **and the Ongoing Irreparable Harm to Lions Gate.**

8       While many of the sites in question complied with take-down requests,

9   certain sites, including those which are the subject of this action, did not.  (Wenokur

10  Decl., ¶ 18.)  In particular, Defendants in this case, who operate websites at the

11  domain names <limetorrents.com>, <billionuploads.com>, <hulkfile.eu>,

12  <played.to> and <dotsemper.com>, have failed to respond to the demands that

13  MarkMonitor has sent on Lions Gate's behalf.  (Cho Decl., ¶¶ 10-18.)

14                      **<limetorrents.com>**

15      On July 25, 2014, MarkMonitor first became aware that the

16  <limetorrents.com> website was disseminating the Stolen Film using the peer-to-

17  peer filesharing "BitTorrent" protocol.  (Cho Decl., ¶ 11.)  Websites that use the

18  BitTorrent protocol, including <limetorrents.com> host small files called "torrent"

19  files.  (*Id*.)  Each torrent file contains an instruction set including a unique "hash

20  value" that allows the end user's client program to locate and connect to a group of

21  other users (called a "swarm") who are all simultaneously sharing copies of, in the

22  case of <limetorrents.com>, the Stolen Film with one another.  (*Id*.)  By

23  downloading one of these torrent files associated with the Stolen Film from

24  <limetorrents.com>, users join a "swarm" where they download parts of the Stolen

25  Film from many different users and also upload to other users parts of the Stolen

26  Film they have already received, until eventually they have reproduced the entire

27  Stolen Film on their own hard drives and, in most cases, have also uploaded all or a

28  substantial part of the Stolen Film to others.  (*Id*.)  True and correct copies of

representative screenshots of the <limetorrents.com> website captured by MarkMonitor on July 31, 2014 are attached to the Cho Decl. as Exhibit A.

MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <limetorrents.com> website on July 26, 30, and 31, but has received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

<p style="text-align:center"><strong>&lt;billionuploads.com&gt;</strong></p>

On July 25, 2014, MarkMonitor first became aware that the <billionuploads.com> website was hosting copies of the Stolen Film in one or more directories where users could download copies of the Stolen Film directly to their computers.  (Cho Decl., ¶ 12.)  True and correct copies of representative screenshots of the <billionuploads.com> website, captured by MarkMonitor on July 31, 2014, are attached to the Cho Decl. as Exhibit B.

MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <billionuploads.com> website on July 25, 26, 27, 28, 29, 30 and 31, but has received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

<p style="text-align:center"><strong>&lt;swankshare.com&gt;</strong></p>

On July 25, 2014, MarkMonitor first became aware that the <swankshare.com> website was hosting copies of the Stolen Film in one or more directories where users could download copies of the Stolen Film directly to their computers.  (Cho Decl., ¶ 13.)  True and correct copies of representative screenshots of the <swankshare.com> website, captured by MarkMonitor on July 31, 2014, are attached to the Cho Decl. as Exhibit C.

MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <swankshare.com> website on July 26, 30 and 31, but has received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

<p style="text-align:center"><strong>&lt;hulkfile.eu&gt;</strong></p>

On July 25, 2014, MarkMonitor first became aware that the <hulkfile.eu> website was hosting copies of the Stolen Film in one or more directories where users

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION                                                    - 6 -
CASE NO. 2:14-CV-06033-MMM-AGR

1  who signed up for the website's service could download copies of the Stolen Film
2  directly to their computers.  (Cho Decl., ¶ 14.)  True and correct copies of
3  representative screenshots of the <hulkfile.eu> website captured by MarkMonitor on
4  July 31, 2014 are attached to the Cho Decl. as Exhibit D.

5      MarkMonitor, on Lions Gate's behalf, issued take-down requests to the
6  operator of the <hulkfile.eu> website on July 26, 27, 28, 29, 30, and 31 but has
7  received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

8                                    **<played.to>**

9      On July 25, 2014, MarkMonitor first became aware that the <played.to>
10  website was hosting copies of the Stolen Film in one or more directories and
11  displaying an embedded viewing window in which users could stream copies of the
12  Stolen Film directly to their screens.  (Cho Decl., ¶ 15.)  True and correct copies of
13  representative screenshots of the <played.to> website captured by
14  MarkMonitor on July 31, 2014 are attached to the Cho Decl. as Exhibit E.

15     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the
16  operator of the <played.to> website on July 25, 26, 27, 28, 29, 30 and 31, but has
17  received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

18                                 **<dotsemper.com>**

19     On July 25, 2014, MarkMonitor first became aware that the <dotsemper.com>
20  website was hosting copies of the Stolen Film in one or more directories where users
21  can download copies of the Stolen Film directly to their computers and displaying
22  an embedded viewing window in which users could stream copies of the Stolen
23  Film directly to their screens.  (Cho Decl., ¶ 16.)  True and correct copies of
24  representative screenshots of the <dotsemper.com > website captured by
25  MarkMonitor on July 31, 2014 are attached to the Cho Decl. as Exhibit F.

26     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the
27  operator of the <dotsemper.com> website on July 26, 27, 28, 29, 30, and 31, but has
28  received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

1   Defendants' willful and ongoing distribution, reproduction, performance and

2   other dissemination of the Stolen Film is not merely a violation of civil law, it is

3   also a criminal act pursuant to 17 USC 506(a)(1)(C), which imposes criminal

4   liability for the "distribution of a work being prepared for commercial distribution,

5   by making it available on a computer network accessible to members of the public,

6   if such person knew or should have known that the work was intended for

7   commercial distribution." Lions Gate is informed and believes that law enforcement

8   authorities are investigating the theft and Defendants' criminal activities.

9   For purposes of this application in connection with its civil claims, Lions Gate

10  emphasizes that Defendants' infringement has caused Lions Gate, as the exclusive

11  licensee of the copyright in the Film in North America, severe and irreparable harm.

12  In distributing and/or aiding the distribution of the Film before its theatrical release,

13  Defendants have unlawfully usurped the benefits of first publication that rightfully

14  belong to Lions Gate. (Wenokur Decl., ¶ 19.) Defendants' unlawful distributions

15  impair the marketability of the Film because they provide consumers with an

16  opportunity to view the Film *in its entirety for free before its theatrical release*. (*Id.*,

17  ¶ 20.) Individuals who view the Film in this manner may not pay for tickets at the

18  box office when the Film is released later this month. (*Id.*) Similarly, such

19  individuals may not purchase or rent copies of the Film when it is released to the

20  home entertainment market after its theatrical run. (*Id.*)

21  Further, the pre-release unlawful distributions impair Lions Gate's ability to

22  control the publicity surrounding the Film. (Wenokur Decl., ¶ 21.) Lions Gate

23  planned for discussions concerning the Film to coincide with the theatrical release of

24  the Film on August 15, 2014. (*Id.*) Now, many news articles are reporting on the

25  Film weeks before the release and are doing so with reference to the leak and not, as

26  Lions Gate hoped, with respect to the content of the Film. (*Id.*) True and correct

27  copies of some of the recent press attention garnered by the leak are attached to the

28  Wenokur Decl. as Exhibit D.

Finally, the pre-release unlawful distributions impair Lions Gate's relationships with its licensees including theater operators.  (Wenokur Decl., ¶ 22.)  Specifically, Lions Gate has negotiated licenses with theater operators to exhibit the Film in theaters.  (*Id*.)  Lions Gate relies on the royalties from these licenses to stay in business, just as its licensees rely on ticket sales to stay in business.  (*Id*.)  The leak of the Film at this time threatens to irreparably harm Lions Gate's relationships with its licensees and with potential customers.  (*Id*., ¶ 23.)  Those relationships depend on Lions Gate's ability to control when, where and under what conditions the Film is distributed and yet Defendants, through their unlawful conduct, are serving to determine when and how the Film is distributed.  (*Id*.)  In sum, Defendants are jeopardizing the successful launch and commercialization of an entertainment product in which Lions Gate has already invested millions of dollars.  (*Id*., ¶ 18.)  These harms cannot be adequately compensated by monetary damages.  (*Id*., ¶ 24.)

## ARGUMENT

### A.    The Standard for Issuance of a Temporary Restraining Order and Preliminary Injunction to Prevent Copyright Infringement.

This Court has the authority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).  Both temporary restraining orders and preliminary injunctions require the plaintiff to establish:  "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest." *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.,* 907 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012) citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365 (2008), *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.,* 240 F.3d 832, 839 n. 7 (9th Cir.2001) and *Lockheed Missile & Space Co. v. Hughes Aircraft,* 887 F.Supp. 1320, 1323

1    (N.D.Cal.1995).  All four requirements are satisfied in this case.

2        **B.    Lions Gate is Entitled to a Temporary Restraining Order and**

3        **Preliminary Injunction to Prevent the Further Infringement of the**

4        **Film.**

5            **1.    This Court has Personal Jurisdiction over Defendants.**

6            The Court has personal jurisdiction over Defendants in this case.  Personal

7    jurisdiction exists if, among other things:  1) the defendant undertakes intentional

8    actions expressly aimed at the forum state and causes harm the brunt of which the

9    defendant knows are likely to be suffered in the forum state; 2) the plaintiff's claim

10   arises out of the defendant's forum-related activities; and 3) the exercise of

11   jurisdiction is reasonable.  *See, e.g.*, *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d

12   1316, 1320 (9th Cir. 1998) holding modified by *Yahoo! Inc. v. La Ligue Contre Le*

13   *Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006).  All of those

14   requirements are satisfied here.

15           First, there is no doubt that Defendants have intentionally aimed their

16   infringement actions at Lions Gate in this state where Lions Gate has its principal

17   place of business, and that they know the brunt of the harm from their infringement

18   will be felt by Lions Gate in California.  *Panavision*, 141 F.3d at 1321-22 (personal

19   jurisdiction existed over non-California defendant who engaged in a scheme to

20   infringe California plaintiff's intellectual property rights on the Internet).  Insofar as

21   more than 20,000 peer-to-peer downloads of the Stolen Film have occurred in the

22   Los Angeles metropolitan area alone, it is also reasonable to conclude that

23   Defendants have consummated acts of infringement within California.

24           Lions Gate's claims arise directly out of Defendants' forum-related activities,

25   *i.e.* their infringement of Lions Gate's intellectual property rights.  There is also no

26   indication that the exercise of personal jurisdiction over Defendants would be

27   unreasonable.  *See Panavision*, 141 F.3d at 1322-23.  To the contrary, personal

28   jurisdiction over Defendants, who remain anonymous and have refused to

1    communicate with Lions Gate despite its repeated efforts, is eminently reasonable

2    given their egregious conduct, the lack of any identifiable alternative forum and

3    California's strong interest in protecting the intellectual property rights of its

4    residents.  *Id*. at 1323.

5              **2.    Lions Gate is Likely to Succeed on all of its Claims Against**

6                        **Defendants.**

7              Insofar as Lions Gate is entitled to broad injunctive relief for each of its three

8    claims, preliminary injunctive relief is appropriate if Lions Gate establishes that it is

9    likely to prevail on even one of its three claims.  *See* 17 U.S.C. 502(a).  But

10   immediate relief is particularly appropriate in this egregious case because Lions

11   Gate is extremely likely to prevail on *all* of its claims.

12             **a.    Lions Gate is Likely to Prevail on its Claim for Direct**

13                        **Copyright Infringement.**

14             To prevail on a claim for direct copyright infringement a plaintiff must prove:

15   1) that it is the legal or beneficial owner of a valid copyright; and 2) that the

16   defendant violated at least one of the exclusive rights owned by the plaintiff as the

17   legal or beneficial copyright holder.  *See* 15 U.S.C. § 501(b); *see also A&M*

18   *Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001); *D.C. Comics v.*

19   *Towle*, -- F.Supp.2d --, CV 11-3934 RSWL OPX, 2013 WL 541430 (C.D. Cal. Feb.

20   7, 2013).  Lions Gate is extremely likely to establish both of these elements.

21             There is no doubt that the Film is the subject of valid copyright protection.

22   Motion pictures such as the Film are such quintessentially protectable creative

23   works that the Copyright Act specifically references them in the section specifying

24   the exclusive rights granted to copyright owners.  *See* 17 U.S.C. § 106.

25             Lions Gate's exclusive license to distribute and otherwise exploit the Film

26   within the United States and North America in theaters, on the Internet and home

27   video media (among other rights) establishes that Lions Gate's ownership of the

28   copyright in the Film for purposes of this lawsuit.  "[I]f a copyright owner grants an

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION                                                                     - 11 -
CASE NO. 2:14-CV-06033-MMM-AGR

exclusive license of particular rights, only the exclusive licensee and not the original owner can sue for infringement of those rights." *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1170 (9th Cir. 2013); *see also* 17 U.S.C. § 501(b).

Lions Gate is certain to establish the second element of its claim for direct infringement because Defendants are distributing and/or publicly performing the Film in its entirety. *See A&M Records, Inc.*, 239 F.3d at 1014 (users who make digital copies of copyrighted works available for others to download violate the exclusive distribution right); *see also Warner Bros. Entm't v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1008-1012 (C.D. Cal. 2011) (provider of unauthorized on-demand movie streaming service violated performance right of copyright owners).

### b.      Lions Gate is Likely to Succeed on its Claim for Contributory Copyright Infringement.

To prevail on its claim for contributory infringement, Lions Gate must establish both ownership of a valid copyright (which Lions Gate will do as discussed in the previous section) and that Defendants intentionally induced, caused or materially contributed to direct infringement by others. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  Liability for contributory copyright infringement attaches to defendants with "*actual knowledge* and those who *have reason to know* of direct infringement."  357 F.3d at 1076.

Lions Gate is extremely likely to establish the elements required for contributory infringement as well.  As an initial matter, Lions Gate will establish the "infringement by others" element required for a claim of contributory infringement. Although Lions Gate is not currently seeking relief against end users who simply used torrent technology to download (and, by definition, upload) the Film, the fact remains that their actions constitute copyright infringement. *See A&M Records, Inc.*, 239 F.3d at 1014.  Lions Gate is also likely to establish that Defendants

1    knowingly induced, caused and/or materially contributed to these end users'

2    infringement by deliberately providing files and/or links that serve no purpose but to

3    connect users to the "swarm" where the Film was being shared.  Furthermore, Lions

4    Gate's demand letters to these Defendants establish that Defendants not only

5    "should have known" that they were contributing to the infringement, but also had

6    actual knowledge of the infringement.

7                    **c.        Lions Gate is Likely to Succeed on its Claim for**

8                            **Vicarious Copyright Infringement.**

9            To prevail on its claim for vicarious infringement, Lions Gate must establish

10   that Defendants have the right and ability to supervise the direct infringement that

11   occurs on and through their websites and also have a direct financial interest in the

12   infringement.  *A&M Records, Inc.*, 239 F.3d at 1023.  Lions Gate will establish both

13   of these elements.

14           First, the Ninth Circuit has held that "financial benefit exists where the

15   availability of infringing material 'acts as a "draw" for customers.'"  *Id*. quoting

16   *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996).  Given

17   the high profile and intense level of anticipation that has accompanied the Film and

18   the massive levels of infringement that have occurred since the initial theft there is

19   no doubt that the Stolen Film acts as a "draw" that attracts users to Defendants'

20   websites (where in many cases Defendants reap an additional financial benefit from

21   paid advertisements).  Second, Defendants have the right and ability to supervise the

22   direct infringement occurring on and through their websites because they have

23   complete control over what content users can access through their websites.  "The

24   ability to block infringers' access to a particular environment for any reason

25   whatsoever is evidence of the right and ability to supervise." *A&M Records, Inc.*

26   239 F.3d at 1023 citing *Fonovisa*, 76 F.3d at 262.

27                    **3.        Lions Gate will Suffer Irreparable Harm if the Court does**

28                            **not Grant Immediate Relief.**

1    The irreparable harm Defendants are causing to Lions Gate is both egregious

2    and undeniable.  The Wenokur Decl. explains how Defendants' infringement is

3    causing Lions Gate irreparable harm in numerous ways.  Among other things,

4    Defendants have stripped Lions Gate of exclusive control over one of its most

5    valuable intellectual property assets, including but not limited to depriving Lions

6    Gate of the critical right of first publication and severely disrupting Lions Gate's

7    carefully-planned marketing and publicity campaign for the Film.  (Wenokur Decl.,

8    ¶¶ 12, 19, 21.)  In so doing, Defendants have also interfered with Lions Gate's

9    relationships with its business partners, damaged Lions Gate's goodwill among

10   consumers by preventing Lions Gate from exercising quality control over the

11   presentation of the Film, and deprived both Lions Gate and many others of revenue

12   that will be impossible to calculate because there is no way of knowing how many

13   people would have paid to see the Film but for Defendants' infringement.  (*Id*., ¶¶

14   20, 22, 23.)

15   Such ongoing damage more than satisfies the irreparable harm requirement

16   for preliminary injunctive relief.  Indeed, this case is markedly similar to *Warner*

17   *Bros. Entm't*, in which a court in this District closely examined the myriad ways in

18   which the unauthorized online dissemination of copyrighted motion pictures

19   irreparably harms the copyright owner.  *See* 824 F.Supp.2d at 1012-14.  In that case

20   the court granted a preliminary injunction to stop the defendants from operating an

21   unauthorized online movie "rental" service that allowed users to stream copies of

22   movies directly to their computer screens.  *Id*. at 1006-08.

23   In granting the preliminary injunction, the court emphasized that harms such

24   as depriving rights owners of control over their intellectual property and the way in

25   which it is presented, interfering with their business relationships and customer

26   goodwill, and depriving rights owners of revenue that cannot be reasonably

27   estimated (and that defendants would be unable to pay in any event) are irreparable

28   and justify the imposition of preliminary injunctive relief.  824 F.Supp.2d at 1012-

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION                                   - 14 -
CASE NO. 2:14-CV-06033-MMM-AGR

14; *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1217 (C.D. Cal. 2007). Indeed, as the court recognized in *Warner Bros.*, infringement on the massive scale undertaken by Defendants in this case "even jeopardize[s] the continued existence of Plaintiffs' licensees' businesses" 824 F.Supp.2d at 1013.

Defendants' infringement also causes irreparable harm to Lions Gate because their unchecked dissemination renders the Film (and other Lions Gate properties that are high profile targets for similar leaks) "vulnerable to continuing infringement on an enormous scale" that cannot be redressed with damages. *Metro-Goldwyn-Mayer Studios*, 518 F.Supp.2d at 1217.

**4.    The Balance of Equities Tips Sharply in Lions Gate's Favor.**

Defendants cannot argue that a temporary restraining order and/or preliminary injunction will cause them to suffer any legitimate hardship. The Ninth Circuit has long held that a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities. 'Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense "merits little equitable consideration[.]"'" *Triad Sys. Corp.*, 64 F.3d 1330 at 1338 quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988).

Here again, *Warner Bros.* provides a useful reference point. In that case, the court found that the balance of equities tipped "sharply in [the plaintiff's] favor" notwithstanding the defendant's assertion that a preliminary injunction would "significantly harm, if not destroy" its on-demand video distribution business. 824 F.Supp.2d at 1014. Here, the defendants have even less of a basis to argue that an injunction would be inequitable because their conduct is *criminal*. *See* 17 USC 506 (a)(1)(C).

**5.    An Injunction is in the Public Interest.**

There is also no doubt that an injunction would serve the public interest.

1    "'[I]t is virtually axiomatic that the public interest can only be served by upholding

2    copyright protections and correspondingly, preventing the misappropriation of

3    skills, creative energies, and resources which are invested in the protected work.'"

4    *Warner Bros.*, 824 F.Supp.2d at 1015, quoting *Apple Computer, Inc. v. Franklin*

5    *Computer Corp.,* 714 F.2d 1240, 1255 (3rd Cir.1983).  As the court in this District

6    observed in another case involving the unauthorized online dissemination of

7    copyrighted works, any interest the public may have "in receiving copyrighted

8    content for free is outweighed by the need to incentivize the creation of original

9    works."  *Metro-Goldwyn-Mayer Studios*, 518 F.Supp.2d at 1222.  Here again, the

10   criminal nature of Defendants' conduct underscores the public interest in an

11   immediate and effective injunction.

### 6.     The Scope of Lions Gate's Requested Injunction is Reasonable and Within the Court's Discretion.

14        The Court has broad discretion to fashion both preliminary and permanent

15   injunctions "on such terms as it may deem reasonable to prevent or restrain

16   infringement of a copyright."  17 U.S.C. § 502(a).  This includes the authority to

17   preliminarily and permanently enjoin not only Defendants, but also their officers

18   agents, servants, employees, attorneys and all other persons acting in active concert

19   or participation with any of them.  Fed.R.Civ.P. 65(d)(2).

20        Lions Gate's requested injunction is well within the scope of the Court's

21   broad equitable authority.  As set forth in further detail in the proposed order

22   submitted herewith, Lions Gate's application seeks entry of a temporary restraining

23   order and preliminary injunction that enjoins Defendants and their officers, agents,

24   servants, employees, and attorneys as well as their Internet service providers and all

25   other persons who are in active concert or participation with any of them from

26   taking any action that will facilitate or enable the infringement of Lions Gate's

27   exclusive rights.  Such preliminary relief is eminently appropriate given the

28   egregious nature of Defendants' conduct and their failure to respond to any of Lions

1    Gates' demands.

2        **C.**    **The Court Should Require No Bond or, in the Alternative, a**

3               **Minimal Bond.**

4        It is well established in the Ninth Circuit that "Rule 65(c) invests the district

5    court 'with discretion as to the amount of security required, *if any.*' " *Jorgensen v.*

6    *Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003) quoting and adding emphasis to

7    *Barahona–Gomez v. Reno,* 167 F.3d 1228, 1237 (9th Cir.1999).  In particular, "[t]he

8    district court may dispense with the filing of a bond when it concludes there is no

9    realistic likelihood of harm to the defendant from enjoining his or her conduct."

10   *Jorgensen*, 320 F.3d at 919.

11       Lions Gate respectfully submits that the Court should exercise its discretion to

12   dispense with the filing of a bond in this case.  As discussed above, there is no

13   realistic likelihood of harm to Defendants in this case because there is no evidence

14   that Lions Gate's requested injunction will cause Defendants any harm other than

15   stopping their unlawful conduct.

16       **D.**    **Defendants Have Received Notice and *Ex Parte* Relief is**

17              **Warranted.**

18       Lions Gate respectfully submits that *ex parte* relief is appropriate in this case.

19   As discussed at length above, the irreparable harm that Defendants' infringement is

20   causing to Lions Gate increases with each passing day.  There is no doubt that Lions

21   Gate's cause will be irreparably prejudiced if its application were to be heard on the

22   normal motion schedule.  *See Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883

23   F.Supp. 488, 492 (C.D. Cal. 1995).  Indeed, if this application were placed on the

24   normal motion schedule it would not be heard until long after the Film has been

25   released.  Furthermore, Lions Gate is without fault in creating the instant crisis.  *See*

26   883 F.Supp. at 492.  Lions Gate has acted swiftly since it learned of the theft and

27   Defendants' subsequent infringement, and tried diligently to contact Defendants

28   directly before seeking relief from the Court.

MEMORANDUM IN SUPPORT OF
EX PARTE APPLICATION
CASE NO. 2:14-CV-06033-MMM-AGR

1    Lions Gate has also provided Defendants with notice of this application, as set

2    forth in the Declaration of Christopher Varas submitted herewith.

3        **E.    Lions Gate is Entitled to an Order Preventing the Transfer of**

4             **Defendants' Assets.**

5        If the Court finds Defendants liable in this case (which Lions Gate is

6    confident it will), Lions Gate will be entitled to recover money damages including

7    but not limited to Defendants' profits attributable to the infringement.  17 U.S.C. §

8    504.  To preserve Lions Gate's right to such recovery against Defendants, who are

9    trafficking in the Stolen Film and can be expected to secret assets to insulate them

10   from judgment, Lions Gate respectfully requests that the Court temporarily freeze

11   Defendants' assets as set forth in Lions Gate's proposed order.

12       Such a preliminary asset freeze is "authorized by the district court's inherent

13   equitable power to issue provisional remedies ancillary to its authority to provide

14   final equitable relief." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d

15   552, 559 (9th Cir. 1992); *see also Federal Trade Commission v. United States Oil &*

16   *Gas Corp.*, 748 F.2d 1431, 1433-1434 (11th Cir. 1984) (District Court may exercise

17   its full range of equitable powers, including a preliminary asset freeze, to ensure that

18   permanent relief will be possible).  Where profits are available as a final remedy—

19   as they are under 17 U.S.C. § 504 – a preliminary asset freeze is an appropriate

20   provisional remedy.  *See, e.g.*, *Datatech Enters. LLC v. FF Magnat Ltd.*, 2012 WL

21   4068624, at *4-5 (N.D. Cal. Sept. 14, 2012) (granting preliminary injunction

22   including an asset freeze in lawsuit for copyright infringement).

23       Therefore, Lions Gate respectfully requests that the Court order the temporary

24   asset freeze specified in its proposed order.

25       Finally, Lions Gate respectfully requests that it be permitted to serve

26   Defendants with notice of any temporary restraining order entered by this Court by

27   electronic mail, which to Lions Gate's knowledge is the most reliable and fastest

28   way of communicating with Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CONCLUSION</u>

For the foregoing reasons, Lions Gate respectfully requests that the Court grant Lions Gate's application and enter the proposed order lodged herewith.


DATED:  August 1, 2014          Respectfully submitted,

                                KILPATRICK TOWNSEND & STOCKTON
                                LLP


                                By:    /s/ Dennis L. Wilson
                                       DENNIS L. WILSON

                                Attorneys for Plaintiff
                                Lions Gate Entertainment Inc.