EXHIBIT A

## AGREEMENT

### "THE EXPENDABLES 3"

This agreement (the "**Agreement**") is made and entered into as of May 18, 2013, by and between Nu Image, Inc. on its own behalf and as the exclusive and irrevocable sales agent for Ex3 Productions, Inc. (individually and collectively, "**Grantor**") and Lions Gate Films Inc. ("**LGF**") with respect to that certain motion picture presently entitled "The Expendables 3".

---

1. **Picture:** The "Picture" shall mean that certain motion picture presently entitled "The Expendables 3", produced by, on behalf of or at Grantor's direction, in the year 2013. For the purposes of clarity, Grantor shall not be required to deliver versions of the Picture other than the final cut of the Picture in accordance with the Delivery Schedule; provided, however, that Grantor shall deliver all prior cuts of the Picture created by, on behalf of, or under the control of Grantor, to LGF on DVD (including, but not limited to, the Rough Cut of the Picture).

"The Expendables 3"
DM.05
Page 2 of 32





## 2.  Territory; Expanded Territory:

a.   Territory Defined:  The " Territory" shall mean and include each of the following: (a) United States of America (including but not limited to, Guam, Saipan, Midway Island, the Trust Territory Islands, the Caroline Islands, the Marshall Islands, the U.S. Virgin Islands, Puerto Rico and American Samoa) ("U.S."), its territories, possessions, trusteeships and commonwealths and all military bases, ships at sea, airlines and oil rigs flying the flag of the U.S., (b)  Canada (including, but not limited to, Quebec, Prince Edward Island, the Northwest Territories, the Yukon Territories and Newfoundland), its territories, possessions, trusteeships and commonwealths, and all military bases, ships at sea, airlines and oil rigs flying the flag of Canada, and (c) for the purposes of Television, Subscription Video-On-Demand and Pay-Per-View exploitation in the U. S. only (the "Additional Television Territory"), Bermuda and the Bahamas Islands (provided that the Spanish language Television, Subscription Video-On-Demand, and Pay-Per-View Rights in Bermuda and the Bahamas Islands shall be non-exclusive). For the avoidance of doubt, LGF shall have no Social Networking or Mobile Application Rights in Bermuda or the Bahamas Islands.

3.  Rights Granted:  LGF is hereby licensed the sole and exclusive right to distribute and exploit the Picture within the Territory and for the Term, in all languages in all media, whether now known or hereafter devised including, but not limited to Theatrical, Home Video Rights (including, without limitation, rental, sell-thru (including, but not limited to, Electronic Sell-Thru, including, but not limited to, Download-to-Own and Download-to-Burn, the exploitation of which shall be subject to the limitations prescribed in subparagraph 3(a) hereinbelow), Video-On-Demand, and other pay-per-transaction methods of distribution), Non-Theatrical (including, without limitation, airlines, ships, hotels, oil rigs, educational institutions, and military bases and embassies), Television (including, without limitation, advertising supported programming, premium programming, network television, ad hoc network television, television syndication, closed circuit, and Pay-Per-View by all methods of delivery, now known or hereafter devised, whether re-uplinked or otherwise, including without limitation, terrestrial, digital terrestrial, Satellite, Cable, MMDS, MDS, DBS, DDT, DIVA, DIVX, SMATV, MATV, ADSL, LPTV, CATV, and other telecommunication systems), Social Networking and Mobile Application Rights, by any and all methods of distribution, whether now known or hereafter devised, including, without limitation, Internet Delivery Mechanisms (the exploitation of which shall be subject to the limitations prescribed in subparagraph 3(a) hereinbelow). Without limiting the generality of the foregoing, the Rights licensed to LGF hereunder shall include, without limitation, the exclusive right to market, advertise, promote and publicize the Picture in all media, whether now known or hereafter devised in the Territory.  Without limiting the generality of the foregoing, LGF is hereby licensed the exclusive right to exploit the Picture in all manner and style including, without limitation, the right to sell, rent, give-away, exhibit, advertise and promote the Picture in all media, whether now

"The Expendables 3"
DM.05
Page 4 of 32

known or hereafter devised. Without limiting the generality of the foregoing license, LGF is hereby licensed the following exclusive rights in and to the Picture-to the extent owned or controlled by Grantor or any parent, subsidiary or affiliated entity of Grantor or any employee, independent contractor or agent of any of the foregoing: all Soundtrack Rights, Music Publishing Rights (including, but not limited to, Master Rights), Electronic Publishing Rights, literary publishing rights (including, without limitation, all print publication and novelization rights) (to the extent owned or controlled by Grantor, or the parent of Grantor or an affiliated or subsidiary entity of Grantor) and Merchandising Rights in and to the Picture. Without limiting the generality of the foregoing license, LGF is hereby licensed the right to exploit and/or license, in any and all media, the Picture and the Picture Versions in any manner and style as LGF shall determine in its sole discretion in connection with the Picture, the promotion thereof, for the purposes of promoting LGF's distribution thereof and LGF (e.g., on LGF's corporate reel). In the event that LGF is required to receive access to the footage, trims and outtakes of the Picture pursuant to the Delivery Schedule (as opposed to physical delivery), then prior to Grantor destroying or electing not to store any footage from the Picture and any trims and outtakes from the Picture, Grantor shall notify LGF in writing and LGF may elect to store such footage, trims and outtakes at LGF ' s cost provided that in any event, any such materials shall remain in the exclusive ownership and control of Grantor (subject to LGF's right to exploit such materials and the terms of the Delivery Schedule) and the use of any and all such materials by LGF shall be subject to any and all contractual restrictions of which LGF is notified in writing on or before the Delivery Date. If LGF does so elect to store such footage, trims and outtakes, Grantor shall have "free" access to all such material. Grantor shall pay for the laboratory charges and duplication costs which Grantor incurs in this regard but shall not be charged any fees by LGF for such access. The rights licensed to LGF in and to the Picture pursuant to this paragraph shall collectively be referred to herein as the "**Rights**" and are more specifically defined in Schedule "A", which is attached hereto and incorporated herein by this reference. For the purposes of clarity, LGF's marketing and advertising of the Picture shall be subject to those third party contractual restrictions (i.e., paid advertising restrictions) that are Delivered to LGF in writing on or before the Delivery Date; provided that Grantor hereby represents and warrants to LGF that LGF shall have the right to use all of the Leads' (as that term is defined in paragraph 8(a)(ii)) names above the title in all key art and paid advertisements concerning the Picture and that LGF shall have the right, but not the obligation, to use all of the Leads' likenesses in all key art and paid advertisements concerning the Picture.



"The Expendables 3"
DM.05
Page 5 of 32



"The Expendables 3"
DM.05
Page 6 of 32



"The Expendables 3"
DM.05
Page 7 of 32



4. **Term:** The "**Term**" of this Agreement shall commence as of the date first written above and shall terminate twenty-five (25) years from complete Delivery of the Picture to LGF in accordance with the Delivery Schedule plus an additional six (6) month exclusive sell-off period.

Notwithstanding the foregoing, if the Picture is released by LGF in any media in any part of the Territory, then, as of such release date, the "Term" shall be deemed to have commenced hereunder.

5. **Minimum Guarantee; Budget:**

"The Expendables 3"
DM.05
Page 8 of 32



6. **Disposition of Revenues:**

"The Expendables 3"
DM.05
Page 9 of 32



"The Expendables 3"
DM.05
Page 10 of 32

"The Expendables 3"
DM.05
Page 11 of 32



"The Expendables 3"
DM.05
Page 12 of 32



"The Expendables 3"
DM.05
Page 13 of 32



"The Expendables 3"
DM.05
Page 14 of 32



" The Expendables 3"
DM.05
Page 15 of 32



"The Expendables 3"
DM.05
Page 16 of 32



" The Expendables 3"
DM.05
Page 17 of 32



"The Expendables 3"
DM.05
Page 18 of 32



7.  **Delivery:**

" The Expendables 3"
DM.05
Page 19 of 32



"The Expendables 3"
DM.05
Page 20 of 32



"The Expendables 3"
DM.05
Page 21 of 32

8.  **Picture Specifications; Credits; Editing:**



"The Expendables 3"
DM.05
Page 22 of 32



"The Expendables 3"
DM.05
Page 23 of 32



"The Expendables 3"
DM.05
Page 24 of 32



"The Expendables 3"
DM.05
Page 25 of 32



9. **Holdbacks:**



10. **Grantor's Representations and Warranties:**

a. <u>Grantor's Representations and Warranties</u>:  Grantor represents and warrants as of the date hereof and also upon Delivery of the Picture that: (i) LGF shall have the right, but not the obligation, to use the name and likeness of the Lead, alone or together with other cast members (as determined by LGF in its sole discretion) in LGF's artwork, marketing, promotion, publicity, advertising and packaging materials concerning the Picture; (ii)  Grantor owns or controls all Rights licensed to LGF under this Agreement and that all such Rights are free of all liens, claims, charges, encumbrances, restrictions, and commitments except for those existing collective bargaining union/ guild liens and, subject to the full execution of a non-disturbance agreement and an intercreditor agreement with LGF and LGF's principal

"The Expendables 3"
DM.05
Page 26 of 32

lending syndicate (provided that the non-disturbance agreement an d intercreditor agreement shall be combined in one document if and to the extent permitted by LGF's principal lending syndicate), except for customary bank and completion bond company liens; (iii) there is no agreement concerning the Picture with any person or entity which, if breached, would or could in any way impair, interfere with, abrogate or adversely or otherwise materially affect any of the Rights licensed to LGF under this Agreement; (iv) Intentionally deleted; (v) it is a corporation duly formed and validly existing in good standing under the laws of California and has the full right, power, legal capacity and authority to enter into and carry out the terms of this Agreement; (vi) neither the Picture, nor any part thereof, nor any materials contained therein or synchronized therewith, nor the title thereof, nor the exercise of any Right, license or privilege licensed to LGF hereunder, violates or will violate, or infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, to the best of Grantor's current knowledge and belief in the exercise of reasonable prudence, the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly competes with or slanders or libels (or constitutes a trade disparagement of) any person or entity whatsoever; (vii) it has no agreement with or obligations to any third party with respect to the Picture which might conflict or interfere with any of the provisions of this Agreement or the use or enjoyment by LGF of any of the Rights licensed to LGF hereunder; (viii) the rights licensed to LGF herein have not been previously granted, licensed, sold, assigned, transferred, conveyed or exploited by any person or entity and Grantor shall not sell, assign, transfer, convey to or authorize any person or entity any right, title or interest in and to the Picture or any part thereof or in and to the dramatic or literary material upon which the Picture is based, which is adverse to or in derogation of the Rights licensed to LGF; (ix) there is no litigation, arbitration, claim, demand, or investigation pending or, to the best of Grantor's current knowledge and belief in the exercise of reasonable prudence, threatened, with respect to the Picture, or the literary, dramatic or musical material upon which the Picture is based or which is contained therein, or concerning the physical properties thereof; (x) Grantor has secured, or by the Delivery Date will have secured, and shall for the duration of this Agreement maintain, all clearances (including, without limitation, all music rights and music clearances) which are necessary for LGF to use and enjoy the Rights licensed to LGF in and to the Picture throughout the Territory for the duration of the Term and that no supplemental or additional use payments shall be required with respect to the exploitation of the Picture (or any portion or element thereof, including, without limitation, the music contained therein) and/or any use or exploitation of any advertising or promotion of the Picture which contains the music as embodied in the Picture (except for customary music public performance fees and residuals arising out of LGF's exploitation of the Picture in the Territory during the Term, which music public performance fees and residuals shall be paid by LGF) except as otherwise approved by LGF in writing; and (xi) Grantor is in all respects in compliance with the requirements of the Child Protection and Obscenity Enforcement Act of 1988, as amended by the Child Protection Restoration and Penalties Enhancement Act of 1990, and all rules and regulations promulgated thereunder (collectively, the "CPOEA") and that the Picture is in all respects in compliance with the requirements of the CPOEA, and does not contain any material that would require Grantor to comply with the recordkeeping requirements of the CPOEA.

   b.   LGF's Representations and Warranties:  LGF represents and warrants to Grantor that: (i) LGF has full authority and ability to enter into and completely perform this Agreement; (ii) LGF has not and will not undertake any action which might impair Grantor's Reserved Rights under this Agreement; (iii) There are no existing or, to the best of LGF's knowledge in the exercise of reasonable prudence, threatened, claims or litigation which would adversely affect or impair LGF's ability to completely

"The Expendables 3"
DM.05
Page 27 of 32

perform under this Agreement: ███████████████████



**11. Indemnities:**

**12. Reporting Periods:**

**13. Audit Rights:**

"The Expendables 3"
DM.05
Page 28 of 32



14. **Assignment:**

"The Expendables 3"
DM.05
Page 29 of 32



**15. No Third Party Beneficiaries:**

**16. Default; Termination:**

17. **Governing Law; Jurisdiction:** This Agreement shall be construed and interpreted pursuant to the Laws of the State of California as it applies to contracts entered into and performed wholly within California or, if appropriate, the federal laws of the United States of America. Any dispute regarding the validity, construction, terms or performance of this Agreement or any other matter in connection therewith shall be submitted to binding arbitration before the JAMS in Los Angeles, California in accordance with the following provisions:

      a.      If the parties cannot agree upon a single arbitrator, each party shall select one arbitrator who has experience in the motion picture industry and both arbitrators so selected shall select a third arbitrator.

      b.      The third arbitrator shall adjudicate the dispute applying the laws of the state of California as it applies to contracts entered into and wholly performed within California or, if appropriate, the federal laws of the United States of America.

      c.      The arbitrator shall issue a written opinion specifying the basis for their award and the types of damages awarded.

      d.      There shall be a court reporter record made of the arbitration hearing and said record shall be the official transcript of the proceedings.

      e.      Witness lists, production of documents and subpoenas in the arbitration shall be in accordance with Section 1280 et seq. of the California Code of Civil Procedure, except that the fifteen (15) day periods set forth in subsections (a)(2)(A) and (B) of Section 1282.2 shall be deemed to be periods of five (5) business days. If the dispute pertains to Delivery, there shall be made available to the arbitrator all relevant materials submitted by LGF or Grantor which purport to constitute completion and delivery of the Picture. The parties shall participate in an exchange of information before the hearing. If any such discovery is not voluntarily exchanged among the parties, the party desiring such discovery may apply to the arbitrator at the outset of the arbitration for particular discovery requests. The arbitrator may deny only such discovery as is unreasonable or is intended to unduly delay the prompt conclusion of the arbitration.

      f.      The decision of the arbitrator (or the majority of the arbitrators, if applicable) shall be binding upon the parties, shall constitute a full and final adjudication of the controversy. The losing party shall pay for the cost of all the arbitrator's and court reporter's fees (including, without limitation, the cost of the arbitration). A judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

18. **Confidentiality:** The terms of this agreement may not be disclosed to any third party except as follows: (i) as a part of either party's customary reporting and audit procedures (provided that a customary non-disclosure and confidentiality agreement is executed), (ii) as required by law (including, but not limited to, SEC regulations) or court order (provided that confidential treatment of the

"The Expendables 3"
DM.05
Page 31 of 32

Agreement is sought), (iii) in settlement of a dispute (provide that a customary non-disclosure and confidentiality agreement is executed), and (iv) to enforce a party's rights under this Agreement. Notwithstanding the foregoing, redacted copies of this Agreement may be shown to third parties in the normal course of business.

**19. Notices:**



This Agreement (inclusive of Schedule "A", Exhibit "A" and Exhibit "C"), when executed, is legally binding unless and until superseded by a more formal agreement incorporating the terms set forth above as well as additional provisions, which when and if executed, shall replace this Agreement.   All items

"The Expendables 3"
DM.05
Page 32 of 32

not addressed above shall be negotiated in good faith pursuant to prevailing industry customs and standards and LGF's and Grantor's standard business practices.

AGREED TO AND ACCEPTED BY:

LIONS GATE FILMS, INC.

Signature

Jason Constantine
Print Name
President, Acquisitions & Co-Productions
Title

8/16/2013
Date


NU IMAGE, INC.

Signature

Print Name

Title

Date

Fax ID Number


EX3 PRODUCTIONS, INC.

Signature

Print Name

Title

Date

Fax ID Number

## SCHEDULE A

### Definitions Annex

All capitalized terms used but not defined herein shall have the meanings ascribed to such in the Agreement to which this **Schedule A** is attached.

1. Airline Rights: **"Airline Rights"** shall mean exploitation of the Picture via direct exhibition in airplanes flying the flag of any country within the Territory.

2. Ancillary Rights: **"Ancillary Rights"** shall mean the right to exploit all ancillary and subsidiary rights to the Picture including but not limited to Merchandising Rights, commercial tie-in rights, Print Publishing Rights, Soundtrack Rights, Master Rights, Music Publishing Rights, Music Performance Rights, Clip Rights, and Electronic Publishing Rights.

3. Clip Rights: **"Clip Rights"** shall mean the right to exploit and/or license, in any and all media, whether now known or hereafter devised, all footage, trims and outtakes (including but not limited to "bloopers", behind-the-scenes and "B-roll" footage) of and from the Picture, and any portions thereof in any manner and style as LGF shall determine in its sole discretion in connection with the creation of other motion pictures and/or other audiovisual works, and to license such footage, trims and outtakes as "stock footage" as that term is commonly understood in the entertainment industry.

4. Digital Locker: **"Digital Locker"** shall mean that method of Electronic Sell-Thru where the consumer is licensed, sold or given the right to access a copy of the Picture at any time (regardless of when the Term may expire) as stored or virtually stored in any format by a retailer, vendor or other third party on a secured hard drive or by other means.

5. Download-to-Burn: **"Download-to-Burn"** shall mean that method of Electronic Sell-Thru where the consumer is licensed, sold or given the right to burn a limited number of copies (e.g., DVD, VHS or Blu-ray copies) of the Picture after having first received a copy of such Picture by electronic, fiberoptic or other non-tangible transmission.

6. Download-to-Own: **"Download-to-Own"** shall mean that method of Electronic Sell-Thru where the consumer is licensed, sold or given the right to store a copy of the Picture on its hard drive, cellular phone, Digital Locker, or other storage receptacle, media or device for an indefinite period of time after having first received a copy of such Picture by electronic, fiberoptic or other non-tangible transmission (irrespective of whether or not there is a download), but the consumer is either not entitled to transfer such copy, or is only entitled to transfer such copy a limited number of times, onto other storage device(s), such as a disc or tape or virtually.

7. Electronic Publishing Rights: **"Electronic Publishing Rights"** shall mean the sole and exclusive right under copyright and otherwise to license, reproduce, use, adapt, distribute, display, perform or create the Picture or any derivative works based on the Picture or any portion thereof in photographic, audio, video, optical, digital or interactive form or in any other form or method of copying, recording, manipulation, transmission or use, whether now known or hereafter devised (the **"Electronic Works"**), the purpose

Initials

of which is to allow the user to selectively display, manipulate or perform the Electronic Work, derivative material based on the Electronic Work or portions thereof, alone or in conjunction with other audio, video, photographic, digital, computer software, firmware, hardware or any other systems now known or hereafter devised including, but not limited to all forms of video games on any and all platforms, CD-I, CD-ROM, game consoles, handheld devices and multimedia but specifically excluding all uses encompassed by the Home Video Rights. Electronic Publishing Rights include, but is not limited to, "**Social Games**" and "**Mobile Applications**".

8. Electronic Sell-Thru: **"Electronic Sell-Thru"** shall mean the electronic, fiberoptic or other non-tangible transmission of the Picture, to a device (e.g., a set-top box, computer, cellular phone, mp3 player, PDA or other device) from an outside source, for viewing, taping, recording or storage on such device or on tape, disc, card, drive, or any other means of permanent data retention for subsequent replay at any time as well as the right to access the Picture stored in a "**Digital Locker**" at any time, whether or not a download is required. Electronic Sell-Thru, includes, but is not limited to, those instances where an entity (regardless of whether such entity is also selling the Picture in packaged media) gives or sells the consumer the right to access such Picture digitally at any time through a Digital Locker, regardless of whether or not there is a download required and irrespective of whether or not there is an upcharge. Electronic Sell-Thru includes, but is not limited to "**Download-to-Own**" and "**Download-to-Burn**".

9. Home Video Rights: **"Home Video Rights"** shall mean the sole and exclusive right under copyright and otherwise to reproduce, distribute, display, promote, market and advertise the Picture (and authorize others to do so) in all languages, in all home video media, whether now known or hereafter devised, including without limitation, all rental and sell-thru methods of distribution by means of Video Devices (including, without limitation, all kinds of tapes, cassettes, discs, chips, cards and other devices, whether now known or hereafter devised, including but not limited to, all formats of videotapes, videocassettes and videodiscs, including, but not limited to, Blu-ray, HD-DVD, DVD and VHS, as such terms are commonly understood in the video industry, which contain the Picture or portions thereof and are intended primarily for home viewing of the Picture or on PSP's and other hand-held devices capable of playing the Picture in their original continuity or otherwise (including, without limitation, devices that are installed in non-traditional home video outlets which enable the viewer to view the Picture (either in a fixed copy or in a non-tangible copy) such as home video players installed in automobiles capable of playing DVDs and/or receiving satellite or internet transmissions, etc.)), and by any and all non-tangible methods of home video distribution, including without limitation, by means of Electronic Sell-Thru (including, but not limited to, Download-to-Own and Download-to-Burn and access through a Digital Locker), Video-On-Demand and other free or pay-per-transaction methods of distribution, by any and all methods of delivery, whether now known or hereafter devised, including, without limitation, fiberoptics and any and all Internet Delivery Mechanisms. Without limiting the foregoing, the Home Video Rights shall include, without limitation, the exclusive right to exploit the Home Video Rights in any manner and style including, without limitation, the right to sell, rent, give-away, exhibit, advertise and promote the Picture in all media, whether now known or hereafter devised.

Initials: 

10. Internet:  "**Internet**" shall mean a non-licensed, open or closed-access data delivery
    network or networks (including broadband delivery networks) for point-to-point or point-
    to-multipoint transfer of digital information (including but not limited to video, audio
    and text) using open protocols (e.g., TCP or IP or any successor protocols thereto,
    whether now known or hereafter devised) to any device capable of accommodating open
    protocol, including televisions, personal computers, set-top boxes, and other Internet-
    enabled devices, and any private or proprietary network that connects to such network(s)
    through bridges or gateways, including, without limitation, the technologies currently
    known as the internet, and Internet II.

11. Internet Delivery Mechanisms:  "**Internet Delivery Mechanisms**" shall mean the
    facilities of a communications system of one or more computer networks that utilize
    TCP/IP or other architecture or that use computer terminals, terminal servers, routers,
    multicasting technology or other high speed data connections, that allow the user to
    engage in two-way transmissions over the system, irrespective of the operator of the
    system or the means by which signals are carried or received.  Without limiting the
    generality of the foregoing, the Internet Delivery Mechanisms shall include the Internet
    as presently configured and all modifications and additions thereto and substitutions
    thereof (including, without limitation, the Internet II, any proprietary computer services,
    any local area network, any computer-assisted interconnected network, DSL and any and
    all other on-line systems), whether using means, methods, processes media or technology
    now known or hereafter devised.  It is specifically acknowledged and agreed that
    distributing a Picture by means of Internet Delivery Mechanisms shall include such
    processes as "downloading" (as such term is used in the Internet industry) a Picture, as
    well as, "streaming" (as such term is used in the Internet industry) a Picture, whether at a
    time determined by the end user or any third party.

12. Master Rights:  "Master Rights" shall mean one hundred percent (100%) of the copyright
    in the Territory (including any and all renewals and extensions thereof) in and to
    all sound recordings embodying music that are created for, and embodied in or used in
    connection with, the Picture (e.g., underscore), including, for the avoidance of doubt, the
    right to administer such copyrights in the Territory.

13. Merchandising Rights:  "**Merchandising Rights**" shall mean the sole and exclusive right
    to manufacture, sell, market and exploit commercial and non-commercial goods and
    services created in connection with the Picture including, without limitation, the right to
    produce and exploit clothing, toys, books, food, novelty items, and games based on the
    Picture or utilizing, depicting or embodying any of the characters, situations or events
    depicted or portrayed in the Picture and the artwork, scenery, props and objects
    appearing or portrayed therein, excluding customary commercial tie-ins and products
    manufactured for the purpose of promoting and publicizing the Picture (which rights are
    also granted to LGF).

14. Mobile Applications:  "**Mobile Applications**" shall mean any audiovisual work of
    authorship embodied in software or other digital electronic form (whether now known or
    hereafter invented) that has been either pre-installed or downloaded to a "**Mobile
    Device**" and is capable of interaction with and/or manipulation by a user on said device.

Initials: 

15. Mobile Device: **"Mobile Device"** shall mean any mobile or handheld device that is capable of receiving audiovisual programming by any means and exhibiting such programming on such device, including, without limitation, cellular phones, pagers, personal digital assistants and other mobile devices now known or hereafter devised.

16. Mobile Platform: **"Mobile Platform"** shall mean a cellular communications system, personal digital communication system, satellite or terrestrial-based multimedia broadcasting service or any other system, network, or service of any kind utilizing any protocol now known or hereafter in existence, including, without limitation, Media Flo, Wireless Application Protocol, Wi-Fi (e.g., 802.11(g)), Wi-Max, 2G, 3G, 4G, DVB-H, DMB, EV-DO, GPRS, GSM, EDGE, CDMA, HSCSD, PCN, UMTS, Bluetooth, IP Datacast, or any successor or similar or dissimilar technology now known or hereafter devised, to transmit audiovisual programming to customers of, or subscribers to services offered by, the operator of such Mobile Platform for reception and exhibition on Mobile Devices.

17. Music Performance Rights: **"Music Performance Rights"** shall mean the right to use and perform any and all music, lyrics and musical compositions contained in the Picture and/or recorded in the soundtrack thereof to the extent necessary to exercise any of its rights hereunder.

18. Music Publishing Rights: **"Music Publishing Rights"** shall mean one hundred percent (100%) of the copyright in the Territory (including any and all renewals and extensions thereof) in and to all musical compositions (including lyrics, if any) created for, and embodied in or used in connection with, the Picture (e.g., underscore), including, for the avoidance of doubt, the right to administer such copyrights in the Territory.

19. Near Video-On-Demand: **"Near Video-On-Demand"** shall mean that method of exhibition of the Picture pursuant to which a motion picture or program is delivered via wire, cable or over-the-air (including, without limitation, via microwave, satellite, fiberoptics or the Internet) on a sufficient number of channels to allow subscribers to view a motion picture or program, in its original continuity or otherwise, at a time scheduled by the NVOD operator with greater frequency than the length of such motion picture or program (*i.e.*, over-lapping exhibitions of such motion picture or program, as scheduled by the NVOD operator, are made available to the subscriber).

20. Non-Theatrical Rights: **"Non-Theatrical Rights"** shall mean LGF's sole and exclusive right to exploit the Picture in any and all non-theatrical markets, including, without limitation, in educational and religious institutions, prisons, hospitals, hotels, restaurants, bars, clubs, dormitories, passenger carrying vehicles, railroads, governmental bodies (including, but not limited to, diplomatic posts and camps, military bases, military vessels and other military installations and reservations of the Armed Forces of the countries within the Territory, including the U.S.O., Veteran's Administration, Red Cross and similar organizations), drilling platforms at sea (including, but not limited to, oil rigs), oil fields, fishing fleets and the like, and which exploitation shall include Ship Rights and Airline Rights, and shall in no event include the Theatrical Rights, Television Rights, or Home Video Rights.

Initials: [signature]

21. Pay-Per-View: "**Pay-Per-View**" shall mean that method of exhibition, whether by means of the Internet or any form of television or other audiovisual display (e.g. personal computer monitors) now known or hereafter devised, in which the viewing consumer purchases the right to view the Picture, in its original continuity or otherwise, on a fee-per-exhibition basis and in which the exhibitor of the Picture (as opposed to the viewing consumer) determines the time and day of the exhibition of the Picture.

22. Print Publishing Rights: "**Print Publishing Rights**" shall mean the right to publish or license for publication the screenplay and/or novelization of the Picture in any and all languages, and to publish in such form any publications as LGF may desire (including, without limitation, books, newspapers, fan magazines, trade periodicals, books on tape, and electronic verbatim displays), and to copyright in LGF's name or in the name of its nominee, synopses, novelizations, serializations, dramatizations, sketches and other adaptations of and selections from the literary property on which the Picture is based and from the screenplay of the Picture, and to use excerpts from such literary property and the Picture in heralds, programs, booklets, posters, lobby displays, pressbooks, EPK's and all other media of advertising and publicity.

23. Ship Rights: "**Ship Rights**" shall mean the right to exploit the Picture via direct exhibition on sea or ocean going vessels flying the flag of any country within the Territory.

24. Social Game: "**Social Game**" shall mean any game played on the Internet via social networking sites (e.g., Facebook) designed to operate as a component of an Alternate Reality Game ("**ARG**") as such term is commonly understood in the video game industry. ARG media shall include, but is not limited to, mobile devices, personal computers, and console product components primarily designed to be component to a total ARG experience.

25. Soundtrack Rights: "**Soundtrack Rights**" shall mean the right to reproduce, distribute, and otherwise exploit phonorecords, or their equivalent, derived from or based upon the Picture (e.g., a soundtrack album), and to license and sublicense the same to any third party (including any subsidiary, affiliate, or other entity which may be related to LGF).

26. Special Versions: "**Special Versions**" shall mean dubbed, translated, narrated and/or subtitled versions of the Picture and any trailers thereof, created by LGF or any other party, including but not limited to cut-in, synchronized and superimposed versions thereof in any language for use in such parts of the Territory as LGF deems advisable, for which Grantor shall provide dubbed, translated, subtitled and/or narrated materials in existence at the date of this Agreement or subsequently created.

27. Subscription Video-On-Demand: "**Subscription Video-On-Demand**" shall mean that method of exhibition of the Picture where the consumer pays a fixed periodic subscription fee or no fee to a service that permits the consumer to view the Picture among other motion pictures and programs, via wire, cable or over-the-air means (including, without limitation, via microwave, satellite, fiberoptics or the Internet) in its original continuity or otherwise, within a reasonable period of time following the

Initials:

viewing consumer's selection and the viewing consumer can then view the Picture at that time or at a later point in time.

28. Subsequent Production Rights: "**Subsequent Production Rights**" shall mean the sole right to exploit all productions that are derivative of the Picture hereunder (e.g., theatrical remakes, sequels, prequels, direct-to-video productions, television productions, spin-offs, live stage productions, musical productions and productions produced for any other media) regardless of form (e.g., theatrical, made-for-cable, episodic television).

29. Television Rights: "**Television Rights**" shall mean the right to exploit the Picture over all forms of television, regardless of the delivery system or payment system (if any) involved, including without limitation, the transmission, retransmission and/or streaming of synchronized audiovisual signals to any audiovisual display device and/or receiver now known or hereafter devised, by any technological means now known or hereafter devised, and regardless of whether, how or how much viewers are charged for the privilege of viewing all or any part of such signals or any television service exploiting them (but specifically excluding the Home Video Rights and any transmission over a Mobile Platform to a Mobile Device). Without limiting the generality of the preceding sentence: the Television Rights shall mean and include, without limitation: (a) the exclusive right to exploit the Picture over advertising supported programming, premium programming, network television, ad hoc network television, television syndication, closed circuit, closed-captioning, secondary audio programming (SAP), basic subscription television, and/or premium subscription television; (b) by all methods of delivery, now known or hereafter devised, whether re-uplinked or otherwise, including without limitation HDTV, fiberoptics, terrestrial, digital terrestrial, satellite, cable, MMDS, MDS, DBS, DDT, DIVA, DIVX, SMATV, MATV, ADSL, LPTV, CATV, and any and all other telecommunication systems and methods of delivery, whether now known or hereafter devised, including, without limitation, by Internet Delivery Mechanisms; and (c) the signals transmitted, retransmitted and/or streamed may be analog and/or digital, point-to-multipoint, and/or point-to-point.

30. Theatrical Rights: "**Theatrical Rights**" shall mean all rights to exploit the Picture by means of direct exhibition in theaters (including, without limitation, indoor, outdoor and drive-in theaters), licensed as such in the place where the exhibition occurs, that are open to the general public to view the Picture.

31. Video Devices: "**Video Devices**" shall mean and include, without limitation, all kinds of tapes, cassettes, discs, chips, cards, flash memory units and other devices, whether now known or hereafter devised, including but not limited to, all formats of videotapes, videocassettes, videodiscs, chips, cards, and other technologies in which the Picture is embodied in a tangible medium of expression (including, without limitation, VHS, DVD, PSP, Blu-ray, HD-DVD and laser discs), as these terms are commonly understood in the video industry which contain the Picture, or portions thereof and are intended primarily for viewing the Picture in its original continuity or otherwise.

32. Video-On-Demand: "**Video-On-Demand**" shall mean that method of exhibition of the Picture in which the viewing consumer (as opposed to the exhibitor of the Picture) has the ability to select the time and day of the exhibition of the Picture and the Picture is

Initials:

then transmitted to the viewing consumer (regardless of whether or not a download is required) via wire, cable or over-the-air (including, without limitation, via microwave, satellite, fiberoptics, the Internet or any other non-tangible method of transmission) following the viewing consumer's selection, the viewing consumer can then view the Picture at such time or at a later point in time, and the viewing consumer may or may not be entitled to embody the Picture in a tangible medium, including, but not limited to, discs, tapes, chips, usb ports and other memory devices. "Video-On-Demand" expressly excludes all forms of Electronic Sell-Thru including, but not limited to, Download-to-Own and Download-to-Burn.

Initials: