1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| LIONS GATE FILMS INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>JOHN DOES 1-10 inclusive, d/b/a,<br><limetorrents.com>,<br><billionuploads.com>, <hulkfile.eu><br><played.to>, <swankshare.com> and<br><dotsemper.com>, *et al*.,<br><br>    Defendants. | Case No. 2:14-cv-06033-MMM-AGRx<br><br>**FINDINGS OF FACT,<br>CONCLUSIONS OF LAW** |

1        This matter came on before the Court on August 8, 2014 at 4 p.m. on the

2   motion for a preliminary injunction filed by plaintiff Lions Gate Films Inc. ("Lions

3   Gate").  The Court ordered that any opposition to Lions Gate's motion be filed and

4   served on all parties no later than August 6, 2014 at 12 p.m.  No oppositions were

5   timely filed, nor has any been filed since that time.  Having reviewed Lions Gate's

6   motion and supporting documents, the Court makes the following findings of fact and

7   conclusions of law:

8   **<u>FINDINGS OF FACT</u>**

9        1.    The Film at issue in this case is "The Expendables 3," which is the

10  forthcoming third installment in the "The Expendables" motion picture franchise.

11  The Film is scheduled for theatrical release in North America on August 15, 2014,

12  and has not been released to date.  (Declaration of Robert Wenokur ("Wenokur

13  Decl."), ¶ 6.)

14       2.    The cast of the Film includes many famous actors, including Sylvester

15  Stallone, Jason Statham, Arnold Schwarzenegger, Mel Gibson, Harrison Ford,

16  Wesley Snipes, Dolph Lundgren and Antonio Banderas, among others.  (Wenokur

17  Decl., ¶ 6.)  The first two films in this franchise, "The Expendables" and "The

18  Expendables 2" generated worldwide box office revenues in excess of $575 million.

19  (*Id.*, ¶ 7.)

20       3.    Lions Gate has obtained the sole and exclusive right to distribute and

21  exploit the Film in the United States and throughout North America.  (Wenokur

22  Decl., ¶ 8.)  Lions Gate's exclusive rights in the Film pursuant to this exclusive

23  license include but are not limited to all rights in the United States and throughout

24  North America to exploit the Film by means of direct exhibition in theaters, by

25  means of the Internet and in all home video media.  (*Id.*, ¶ 8, Exh. A (Agreement, ¶

26  3).)

27       4.    The Film is the subject of Copyright Registration No. Pau003734299

28  (Supplemental Declaration of Christopher Varas, Exhibit A.) In addition, the

1    screenplay for the Film is the subject of United States Copyright Registration No.

2    PAu003704583, issued on July 10, 2013, which is valid, subsisting and in full force

3    and effect.  (Wenokur Decl., Exhibit B.)

4         5.    Given the success of the first two films, Lions Gate anticipates that the

5    Film will be highly successful as well.  (Wenokur Decl., ¶ 11.)  Accordingly, Lions

6    Gate has invested millions of dollars to acquire distribution rights to the Film and

7    millions more in connection with marketing and promoting the Film's release.  (*Id*.)

8         6.    Lions Gate has planned and has already begun to execute an extensive

9    marketing and publicity campaign for the Film including television, radio and print

10   advertising and promotion.  (Wenokur Decl., ¶ 12.)

11        7.    Lions Gate has not authorized anyone to distribute the Film within the

12   United States or North America on the Internet or anywhere else prior to the planned

13   release date.  (Wenokur Decl., ¶ 13.)

14        8.    As part of Lions Gate's customary anti-piracy efforts, the company

15   retained outside vendors, including MarkMonitor, to identify and address as

16   appropriate any potential or actual piracy relating to the Film.  (Wenokur Decl., ¶

17   14.)

18        9.    On or about July 24, 2014, Lions Gate learned that a digital file

19   containing a high quality reproduction of the Film had been uploaded to the Internet

20   without its  authorization or consent.  (Wenokur Decl., ¶ 15.)

21        10.   Although  investigations are ongoing, Lions Gate has concluded  that

22   an individual unlawfully obtained a copy of the Film through fraudulent or

23   otherwise unlawful means.  (Wenokur Decl., ¶ 15.)

24        11.   Lions Gate understands that only a single digital file containing the

25   Film was stolen, and that every copy of the Film alleged in its complaint (and every

26   copy available anywhere on the Internet) originated from and is a reproduction of

27   that single original digital file (the "Stolen Film").  (Wenokur Decl., ¶ 16.)

28        12.   Even a single unauthorized leak of a film property such as the one at

FINDINGS OF FACT AND CONCLUSIONS OF LAW                                        - 3 -
CASE NO. 2:14-CV-06033-MMM-AGR

1    issue in this action can have immediate and severe adverse consequences to film

2    distribution companies such as Lions Gate.  (Wenokur Decl., ¶ 17.)  This is because

3    digital technology enables exact duplication of copyrighted content at the press of a

4    computer keypad or mouse.  (Wenokur Decl., ¶ 17.)  Accordingly, from a single

5    digital copy of a work thousands of near exact copies of the work can quickly be

6    made and proliferate.  (*Id*.)

7         13.    Within days after Lions Gate detected the theft of a copy of the Film,

8    copies of the Stolen Film in its entirety were available on hundreds of websites.

9    (Wenokur Decl., ¶ 17.)  As of July 31, 2014, the Stolen Film had been downloaded

10    more than 2.1 million times worldwide on peer-to-peer networks, including

11    approximately 247,000 downloads in the United States.  (Declaration of Edward

12    Cho ("Cho Decl."), ¶¶ 6, 7.)

13         14.    As of July 31, 2014, of  peer-to-peer downloads in the United States,

14    approximately 21,000 (or 8.5%) were to individuals in the Los Angeles metropolitan

15    area.  (Cho Decl., ¶ 7.)

16         15.    The Stolen Film is also available on the Internet for downloading and

17    streaming through websites that do not constitute peer-to-peer networks.  (Cho

18    Decl., ¶ 6.)  Lions Gate estimates that the Film has been downloaded and/or

19    streamed hundreds of thousands, if not millions, of  times worldwide outside peer-

20    to-peer networks.  (*Id*.)

21         16.    After Lions Gate learned of the theft, it instructed MarkMonitor to

22    devote substantial resources to cataloging all websites and online services offering

23    pirated copies of the Stolen Film.  (Wenokur Decl., ¶ 18.)  Further, Lions Gate

24    instructed MarkMonitor to follow up with take-down requests to the operators of the

25    sites in question.  (*Id*.)

26         17.    As of July 31, 2014, MarkMonitor had sent approximately 2,770 take-

27    down requests covering, cumulatively, 10,846 unique host URLs (since a single

28    website often has multiple URLs hosting the Stolen Film, MarkMonitor can and

1   does request that the operator of a single website remove multiple unique host

2   URLs).  (Cho Decl., ¶ 9.)

3          18.     In the vast majority of instances the recipients responded by taking

4   down the Stolen Film and otherwise taking steps to avoid the piracy of the Stolen

5   Film.  (Cho Decl., ¶ 9.)

6          19.     While many of the sites in question complied with take-down requests,

7   certain sites, including those which are the subject of this action, did not.  (Wenokur

8   Decl., ¶ 18.)

9          20.     In particular, Defendants in this case, who operate websites at the

10  domain names <limetorrents.com>, <billionuploads.com>, <hulkfile.eu>,

11  <played.to>, <swankshare.com>, and <dotsemper.com>, failed to respond to the

12  demands that MarkMonitor has sent on Lions Gate's behalf.  (Cho Decl., ¶¶ 10-18.)

13         21.     On July 25, 2014, MarkMonitor first became aware that the

14  <limetorrents.com> website was disseminating the Stolen Film using the peer-to-

15  peer file-sharing "BitTorrent" protocol.  (Cho Decl., ¶ 11.)

16         22.     Websites that use the BitTorrent protocol, including

17  <limetorrents.com> host small files called "torrent" files.  (Cho Decl., ¶ 11.)  Each

18  torrent file contains an instruction set including a unique "hash value" that allows

19  the end user's client program to locate and connect to a group of other users (called

20  a "swarm") who are all simultaneously sharing copies of, in the case of

21  <limetorrents.com>, the Stolen Film with one another.  (*Id.*)

22         23.     By downloading one of these torrent files associated with the Stolen

23  Film from <limetorrents.com>, users join a "swarm" where they download parts of

24  the Stolen Film from many different users and also upload to other users parts of the

25  Stolen Film they have already received, until eventually they have reproduced the

26  entire Stolen Film on their own hard drives and, in most cases, have also uploaded

27  all or a substantial part of the Stolen Film to others.  (Cho Decl., ¶ 11.)

28         24.     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the

operator of the <limetorrents.com> website on July 26, 30, and 31, but received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

25.     On July 25, 2014, MarkMonitor first became aware that the <billionuploads.com> website was hosting copies of the Stolen Film in one or more directories where users could download copies of the Stolen Film directly to their computers.  (Cho Decl., ¶ 12.)

26.     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <billionuploads.com> website on July 25, 26, 27, 28, 29, 30 and 31, but received no response prior to Lions Gate filing its motion.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

27.     On July 25, 2014, MarkMonitor first became aware that the <swankshare.com> website was hosting copies of the Stolen Film in one or more directories where users could download copies of the Stolen Film directly to their computers.  (Cho Decl., ¶ 13.)

28.     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <swankshare.com> website on July 26, 30 and 31, but received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

29.     On July 25, 2014, MarkMonitor first became aware that the <hulkfile.eu> website was hosting copies of the Stolen Film in one or more directories where users who signed up for the website's service could download copies of the Stolen Film directly to their computers.  (Cho Decl., ¶ 14.)

30.     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <hulkfile.eu> website on July 26, 27, 28, 29, 30, and 31 but received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

31.     On July 25, 2014, MarkMonitor first became aware that the <played.to> website was hosting copies of the Stolen Film in one or more directories and displaying an embedded viewing window in which users could stream copies of the Stolen Film directly to their screens.  (Cho Decl., ¶ 15.)

32.     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <played.to> website on July 25, 26, 27, 28, 29, 30 and 31, but received no response prior to Lions Gate filing its motion.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

33.     On July 25, 2014, MarkMonitor first became aware that the <dotsemper.com> website was hosting copies of the Stolen Film in one or more directories where users can download copies of the Stolen Film directly to their computers and displaying an embedded viewing window in which users could stream copies of the Stolen Film directly to their screens.  (Cho Decl., ¶ 16.)

34.     MarkMonitor, on Lions Gate's behalf, issued take-down requests to the operator of the <dotsemper.com> website on July 26, 27, 28, 29, 30, and 31, but received no response.  (Cho Decl., ¶¶ 17, 18; Ex. G.)

35.     Defendants' unlawful distributions impair the marketability of the Film because they provide consumers with an opportunity to view the Film in its entirety for free before its theatrical release.  (Wenokur Decl., ¶ 20.)

36.     Individuals who view the Film in this manner may not pay for tickets at the box office when the Film is released later this month.  (Wenokur Decl., ¶ 20.)

37.     Similarly, such individuals may not purchase or rent copies of the Film when it is released to the home entertainment market after its theatrical run.  (Wenokur Decl., ¶ 20.)

38.     Further, the pre-release unlawful distributions impair Lions Gate's ability to control the publicity surrounding the Film.  (Wenokur Decl., ¶ 21.)

39.     Lions Gate planned for discussions concerning the Film to coincide with the theatrical release of the Film on August 15, 2014.  (Wenokur Decl., ¶ 21.) Now, many news articles are reporting on the Film weeks before the release and are doing so with reference to the unauthorized copies available on the Internet  rather than the content of the Film.  (*Id.*, Ex. D.)

40.     The pre-release unlawful distributions impair Lions Gate's

1  relationships with its licensees including theater operators.  (Wenokur Decl., ¶ 22.)

2  Specifically, Lions Gate has negotiated licenses with theater operators to exhibit the

3  Film in theaters.  (*Id.*)  Lions Gate relies on  royalties from these licenses to stay in

4  business, just as its licensees rely on ticket sales to stay in business.  (*Id.*)

5        41.   The leak of the Film at this time threatens irreparable harm to Lions

6  Gate's relationships with its licensees and with potential customers.  (Wenokur

7  Decl., ¶ 23.)

8        42.   Those relationships depend on Lions Gate's ability to control when,

9  where and under what conditions the Film is distributed and yet Defendants, through

10  their unlawful conduct, are determining when and how the Film is distributed.

11  (Wenokur Decl., ¶ 23.)

12                              **CONCLUSIONS OF LAW**

13        1.   This Court has the authority to "grant temporary and final injunctions on

14  such terms as it may deem reasonable to prevent or restrain infringement of a

15  copyright."  17 U.S.C. § 502(a).

16        2.   A preliminary injunction requires the plaintiff to establish:  "(1) a

17  likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving

18  party in the absence of preliminary relief; (3) that the balance of equities tips in favor

19  of the moving party; and (4) that an injunction is in the public interest."  *Rovio Entm't*

20  *Ltd. v. Royal Plush Toys, Inc.,* 907 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012) (citing

21  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), *Stuhlbarg Int'l Sales*

22  *Co., Inc. v. John D. Brush & Co.,* 240 F.3d 832, 839 n. 7 (9th Cir.2001), and

23  *Lockheed Missile & Space Co. v. Hughes Aircraft,* 887 F.Supp. 1320, 1323 (N.D.

24  Cal. 1995)).  All four requirements are satisfied in this case.

25        3.   Lions Gate is likely to prevail on its claim for direct infringement.  To

26  prevail on this claim, Lions Gate must prove:  1) that it is the legal or beneficial

27  owner of a valid copyright; and 2) that the defendant violated at least one of the

28  exclusive rights owned by the plaintiff as the legal or beneficial copyright holder.

1    *See* 15 U.S.C. § 501(b); see also *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004,

2    1013 (9th Cir. 2001); *D.C. Comics v. Towle*, 989 F.Supp.2d 948, 961  (C.D. Cal.

3    2013).

4          4.      Lions Gate is likely to establish that the Film is the subject of valid

5    copyright protection and that it has standing to bring this action because it is the

6    exclusive licensee of those rights.  Motion pictures such as the Film are such

7    quintessentially protectable creative works that the Copyright Act specifically

8    references them in the section specifying the exclusive rights granted to copyright

9    owners.  *See* 17 U.S.C. § 106.  Moreover, the copyright for  the Film issued by the

10    United States Copyright Office is prima facie evidence that the copyright in the Film

11    is valid.  *See Triad Sys. Corp. v. Se. Exp. Co.,* 64 F.3d 1330, 1335 (9th Cir. 1995)

12    (granting preliminary injunction), superseded by statute on other grounds as stated in

13    *Apple Inc. v. Psystar Corp.,* 658 F.3d 1150, 1158 (9th Cir. 2011).

14          5.      The license agreement grants Lions Gate the exclusive license to

15    distribute and otherwise exploit the Film within the United States and North America

16    in theaters, on the Internet and over home video media (among other rights). Lions

17    Gate is therefore likely to establish it has standing to bring this action.  *Righthaven*

18    *LLC v. Hoehn*, 716 F.3d 1166, 1170 (9th Cir. 2013) ("[I]f a copyright owner grants an

19    exclusive license of particular rights, only the exclusive licensee and not the original

20    owner can sue for infringement of those rights"); *see also* 17 U.S.C. § 501(b).

21          6.      Lions Gate is likely to establish the second element of its claim for direct

22    infringement because it has adduced evidence  that Defendants are distributing and/or

23    publicly performing the Film in its entirety.  *See A&M Records, Inc.*, 239 F.3d at

24    1014 (users who make digital copies of copyrighted works available for others to

25    download violate the exclusive distribution right); see also *Warner Bros. Entm't v.*

26    *WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1008-1012 (C.D. Cal. 2011) (provider of

27    unauthorized on-demand movie streaming service violated the performance right of

28    copyright owners).

7.     Defendants' conduct in distributing the Film before its theatrical release has impaired Lions Gate's exclusive control over one of its most valuable intellectual property assets – its right of first publication – and disrupted Lions Gate's marketing and publicity campaign for the Film.

8.     In so doing, Defendants have also interfered with Lions Gate's relationships with its business partners, damaged Lions Gate's goodwill among consumers by preventing Lions Gate from exercising control over the presentation of the Film, and deprived both Lions Gate and many others of revenue that will be impossible to calculate because there is no way of knowing how many people would have paid to see the Film but for Defendants' infringement.

9.     The harm that Defendants are causing is irreparable and justifies the imposition of preliminary injunctive relief. *Warner Bros.*, 824 F.Supp.2d at 1012-14; see also *Grokster*, 518 F.Supp.2d at 1217.

10.     Defendants' infringement also causes irreparable harm to Lions Gate because their unchecked dissemination renders the Film "vulnerable to continuing infringement on an enormous scale" that cannot be redressed with money damages. *Grokster*, 518 F.Supp.2d at 1217.

11.     The balance of equities also tips sharply in Lions Gate's favor. The Ninth Circuit has long held that a defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities. 'Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration[.]'" *Triad Sys. Corp.*, 64 F.3d 1330 at 1338 (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir.1988) (final, internal quotation marks omitted)).

12.     An injunction is in the public interest. "'[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and

1    resources which are invested in the protected work.'"  *Warner Bros.*, 824 F.Supp.2d

2    at 1015 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240,

3    1255 (3rd Cir. 1983)).  Any interest the public may have "in receiving copyrighted

4    content for free is outweighed by the need to incentivize the creation of original

5    works."  *Grokster*, 518 F.Supp.2d at 1222.

6         13.    It is appropriate to dispense with the filing of a bond.  It is well

7    established in the Ninth Circuit that "Rule 65(c) invests the district court 'with

8    discretion as to the amount of security required, *if any.*'"  *Jorgensen v. Cassiday,* 320

9    F.3d 906, 919 (9th Cir. 2003) (quoting and adding emphasis to *Barahona–Gomez v.*

10   *Reno,* 167 F.3d 1228, 1237 (9th Cir. 1999)).  In particular, "[t]he district court may

11   dispense with the filing of a bond when it concludes there is no realistic likelihood of

12   harm to the defendant from enjoining his or her conduct." *Jorgensen*, 320 F.3d at

13   919.  The Court finds no realistic likelihood that a preliminary injunction will harm

14   Defendants.

15        14.    An order preventing the transfer of Defendants' assets is appropriate.

16   Such a preliminary asset freeze is "authorized by the district court's inherent

17   equitable power to issue provisional remedies ancillary to its authority to provide

18   final equitable relief."  *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d

19   552, 559 (9th Cir. 1992); see al*so Federal Trade Commission v. United States Oil &*

20   *Gas Corp*., 748 F.2d 1431, 1433-1434 (11th Cir. 1984) (District Court may exercise

21   its full range of equitable powers, including a preliminary asset freeze, to ensure that

22   permanent relief will be possible).  Where profits are available as a final remedy – as

23   they are under 17 U.S.C. § 504 – a preliminary asset freeze is an appropriate

24   provisional remedy.  See, e.g., *Datatech Enters. LLC v. FF Magnat Ltd.*, 2012 WL

25   4068624, at *4-5 (N.D. Cal. Sept. 14, 2012) (granting a preliminary injunction

26   including an asset freeze in a lawsuit for copyright infringement).

27

28

1        15.    Such an asset freeze is appropriate in this case to preserve Lions Gate's

2    right to such recovery against Defendants, who are trafficking in the Stolen Film and

3    may secret assets to insulate them from judgment.

4

5        Based on  these findings of fact and conclusions of law, the Court grants Lions

6    Gate's motion for preliminary injunction.

7

8    Entered this Eighth day of August, 2014 at 4:10 p.m.

9

10

11   _____
     Hon. Margaret M. Morrow
12   United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28